Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Wayne R. Andersen | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 5827 | **DATE** | 12/10/2001 |
| **CASE TITLE** | U.S.A. ex rel Hafis Haqq vs. Lamark Carter | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] **Enter MEMORANDUM, OPINION AND ORDER: For the foregoing reasons, we deny the Section 2254 petition [1-1] for a writ of habeas corpus brought by petitioner Hafis Haqq. This is a final and appealable order. This case is terminated.**

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | Document Number |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | DEC 11 2001 date docketed | 35 |
| ✓ | Docketing to mail notices. | | |
| ✓ | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| TSA | courtroom deputy's initials | 01 DEC 10 PM 4:27 date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. HAFIS HAQQ | ) ) ) |
| Petitioner, | ) ) ) No. 98 C 5827 |
| v. | ) ) Wayne R. Andersen |
| LAMARK CARTER, | ) District Judge ) |
| Respondent. | ) |

DOCKETED
DEC 1 1 2001

## MEMORANDUM, OPINION AND ORDER

This case is before the Court on the petition of Hafis Haqq for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the following reasons, we deny the petition for habeas corpus.

## BACKGROUND

Haqq does not challenge the statement of facts set forth in the order of the Illinois Appellate Court affirming his first degree felony murder and second degree murder convictions. *People v. Haqq*, No. 1-94-0859 (Ill. App. Ct. Dec. 4, 1996). For purposes of federal habeas review, "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e). Accordingly, we will adopt the facts as our own.

At trial, Eva Jabra testified that her husband, Mike Jabra, owned two car lots, one located at 4150 S. Western ("41st Street") and another at 7120 S. Western ("71st Street") in Chicago, Illinois. The names of the car lots were "Jak Auto Sales." Jamal Ghanayem testified that, in January 1993, he worked at Jak Auto Sales as a salesman. On the afternoon of January 14, 1993, Haqq came to the 71st Street lot and expressed an interest in a used car. Ghanayem told Haqq to return after 5 p.m. that day so that the salesman then on duty could arrange a test drive. Haqq

agreed to return later in the day.

Aldrick Campbell testified that, on January 14, 1993, he was employed at Jak Auto Sales as a porter. January 14 was his first day working at Jak Auto Sales. Campbell testified that Haqq returned to the 71st Street lot sometime after another salesman, Austin Rivers, relieved Ghanayem as the salesman on duty. Haqq said he wanted to test drive the used car he inquired about earlier and that he was willing to pay cash for it. After they completed the test drive, Haqq entered a trailer on the lot that served as the sales department. Shortly thereafter, Jabra arrived at the lot to commence the sales negotiation with Haqq. When Jabra arrived, Campbell listened at the door while the negotiations took place. Campbell testified at trial that Haqq said he was nervous because he had been robbed and shot once before. Jabra told Campbell to go outside and not let anyone enter the trailer.

Campbell testified that he was outside the trailer when he heard what sounded like gunshots or firecrackers. He then saw Haqq walking towards the used car he was interested in purchasing and enter the car on the driver's side. Campbell then approached Haqq in the car and asked him what he was doing. Haqq responded, "I just bought the car" and showed the keys to Campbell. Haqq then pointed a gun at Campbell and ordered him to get in the car. Campbell slammed the car door closed and ran away. There happened to be two Chicago police officers in the immediate vicinity and Campbell told the officers that Haqq had taken the car illegally. Campbell then entered the trailer and discovered that Rivers and Jabra had been shot.

Austin Rivers testified at trial that when he arrived for work at Jaks Auto Sales on January 14, 1993, he met Haqq and accompanied him on a test drive of a used car. After the test drive, Haqq indicated he wanted to purchase the car and he then entered the sales trailer. Haqq

said he wanted to put the car in his girlfriend's name because he had no identification. Haqq gave a name and address for his girlfriend, which Rivers wrote on a piece of paper. Subsequently, Haqq indicated he wanted to make the sales deal with "the boss," so Rivers phoned the other lot and spoke with Jabra. As they waited for Jabra, Haqq mentioned that he had been robbed once before. Once Jabra arrived, Rivers walked into his own office in the trailer and began reading the newspaper. Rivers testified that Haqq told Jabra that his girlfriend would be coming to the lot to sign the necessary papers. After some time, it became clear that Haqq's girlfriend was not coming and Jabra offered to register the car in Haqq's name. Haqq gave his name and social security number for the credit check. Haqq stated that his name was "Ronald Brown." Jabra called his secretary at the 41st Street lot to give her Haqq's information for the necessary credit check. Jabra told his secretary, Patricia Armstrong, that he believed he had previously sold a car to "Ronald Brown" and whispered that she should identify the car as a 1984 Chevrolet Caprice.

At around 6:45 p.m., Haqq came into Rivers' office, pointed a dark-colored pistol at Rivers, and told him to walk to Jabra's office. Once there, Haqq pushed Rivers into that office and demanded the keys to the vehicle he was interested in. Haqq then ordered Rivers and Jabra to kneel against the wall. As Rivers started to kneel, he heard a shot and felt a burning in his thigh. Rivers sank to the floor and heard a rapid series of gunshots. He opened his eyes and saw Haqq pointing a gun at his face. Haqq then shot Rivers in the face and he subsequently passed out. When Rivers awoke, he saw Jabra lying on the floor and breathing heavily. Jabra subsequently died from the wounds he received. Later, during the course of his testimony, Rivers also testified that Jabra kept no guns at the 71st Street office.

3

Nasir Hadu, who owned the car lot next to Jak's Auto Sales, testified that his trailer was 30 to 35 feet from the Jak's sales trailer. Hadu was standing on the porch of his trailer when he heard gunfire from next door. He looked through the window of the Jak's trailer and saw Haqq pointing a gun downward and firing in many directions. Hadu had seen Haqq standing on the porch of Jak's Auto Sales trailer looking around before he heard the gunshots.

Two Chicago police officers testified that they chased Haqq in the used car for about two blocks southward on Western. The police were using their lights and sirens. Haqq drove through a red light at about 65 m.p.h. and then turned around and headed in the opposite direction. He eventually abandoned the car in the middle of the street at 72nd and Claremont. An officer recovered a .380 caliber Llamma pistol from under the front seat of the used car. A police expert testified that seven spent shell casings and two fired bullets found at the crime scene had been fired from the Llamma pistol. Another officer testified that the two addresses Haqq had given at the car lot were both false. Haqq was apprehended after the police and the FBI traced the social security number Haqq had given to Rivers and Jabra.

Before the defense presented its case, a hearing was held outside the presence of the jury. Defense counsel stated that, on the first day of the trial, the prosecutors told him that Jabra's brother, Adell Jabra, had given the prosecutors a gun that Adell found three days after the shooting locked in a safe at the 41st Street lot. The trial judge determined that this evidence was not relevant and ruled that defense counsel could not call Adell to testify about finding the gun.

In his own defense, Haqq testified that, when he returned from the test drive, he told Rivers, and later Jabra, that he would be able to finance the car the next week. When Jabra arrived, he said that he could only reduce the price if Haqq paid in cash. Jabra then asked if

4

Haqq's brother had purchased a Chevrolet Caprice from Jak's. Haqq falsely said "yes" thinking it might help him get a better deal. Jabra kept saying he knew Haqq had the money to purchase the car. Next, according to the petitioner, Jabra told Campbell to go outside and not let anyone in. Rivers then pulled a gun from a desk and cocked it. Subsequently, Jabra asked if Haqq's brother had stolen a Chevy Blazer from Jak's and he demanded that Haqq give Jabra money for the stolen Blazer. When Haqq denied the accusation, Jabra told Rivers to give him (Jabra) the gun. As Rivers passed Haqq, Haqq wrestled the gun away from him. As Haqq was running out the door of the trailer, Rivers allegedly yelled to Jabra to get "the other gun" from the drawer under the desk. Haqq testified that he feared for his life and he believed that, because the trailer had a window, Jabra would be able to shoot at him if he merely fled from the office. Therefore, Haqq testified that he shot the gun in order to scare the other men so that he could flee in relative safety. He claimed that he was not shooting "at" Jabra and Rivers but rather was only "shooting towards them." He did not see what happened to them after he discharged the gun because he was focusing on reaching the exit to the trailer.

Haqq further testified that, after he finished firing the gun, he ran straight to the used car, he told Campbell that "They made me shoot them," he pointed to the gun on the passenger seat, and he told Campbell that the gun belonged to him (Campbell). He denied telling Campbell that he had just purchased the car. According to Haqq, he wanted Campbell to accompany him to a police car located nearby in order to inform the police that the gun was not his. When Campbell ran to the police by himself, Haqq started the car and drove away. Although the police were chasing him, Haqq testified that he did not stop to explain that he shot the men in self-defense because he was afraid of what the police would think when they saw the gun sitting in the car.

5

He parked the car, left it running, and went to his cousin's house.

At the conclusion of Haqq's testimony, and again without the jury present, defense counsel asked that he be allowed to present the evidence about the gun kept in the safe at the 41st Street lot. The trial court denied the request. The trial judge ruled that the evidence was not relevant because it did not corroborate the defense theory that Jabra had a second gun at the 71st Street lot. The jury then returned verdicts finding Haqq guilty of first degree (felony) murder, second degree murder, two counts of armed robbery, and aggravated battery with a firearm. The trial court sentenced Haqq to 55 years imprisonment for murder and terms of 15 years each for armed robbery and aggravated battery (the Illinois Appellate Court later vacated the armed robbery convictions). The lesser terms were to be served concurrently to one another, but consecutively to the murder sentence.

Following the trial, defense counsel filed a post-trial motion alleging, *inter alia*, that several of the State's witnesses knew that the gun Haqq had used to shoot Jabra actually belonged to Jabra. Defense counsel also stated that he was not furnished a copy of a major crime worksheet until after trial. The worksheet indicated that Patricia Armstrong told the police that Jabra had taken a .380 Llamma with him to the 71st Street lot. Counsel argued that if he had seen the worksheet before trial, he would have examined Armstrong, Campbell and the police officers about the .380 Llamma found at the 41st Street lot.

In response to the post-trial motion, the State produced a discovery receipt signed by defense counsel for 106 pages plus the two page worksheet. The prosecutors also told the trial judge that the gun found at the 41st Street lot was not a .380 caliber Llamma. It was a 9 millimeter pistol. An ownership trace was attempted on the Llamma but the gun could not be

traced to any particular individual. No trace was conducted on the 9 millimeter because the State did not known about the gun until the Friday before jury selection.

At an evidentiary hearing on Haqq's post-trial motion, Armstrong testified that she spoke with the police after the shooting and told them that Jabra had taken his gun when he left the 41st Street lot. On cross-examination, Armstrong explained that she realized that Jabra had not taken his gun because she was present when the gun was found in the safe at the 41st Street lot three days later. She assumed he took the gun because he went to the safe where he usually kept the gun before he left for the 71st Street lot. However, she never said she saw Jabra take a .380 Llamma to the 71st Street lot.

Detective James Riley testified during the evidentiary hearing that he prepared the major crime worksheet. Riley interviewed Campbell, but he was not the officer who interviewed Armstrong. Defense counsel asked Riley if the report indicated that Campbell stated that Jabra had a .380 Llamma when he arrived at the 71st Street lot. Riley testified that the worksheet was not accurate but that he believed it was accurate when he prepared it. Campbell testified that he never said Jabra had .380 Llamma when he arrived at the 71st Street lot.

After argument by both sides, the trial judge denied Haqq's motion for a new trial. The judge found that defense counsel had signed the receipt for discovery documents, including the major crime worksheet. The judge also determined that the testimony about the worksheet and the gun would not have changed the outcome of the trial.

## PROCEDURAL HISTORY

Haqq appealed his conviction and sentence to the Illinois Appellate Court raising the following four issues: 1) the trial judge improperly excluded evidence that the gun used belonged

7

to the murder victim; 2) defense counsel at trial was ineffective for failing to learn of evidence regarding the gun until after trial; 3) separate counsel should have been appointed to represent Haqq at the post-trial motion because trial counsel's competency was in question; and 4) the convictions for armed robbery should be vacated because they were lesser included offenses of felony murder. On December 4, 1996, the Illinois Appellate Court vacated the armed robbery convictions and affirmed the remainder of the judgment. Haqq then filed a timely petition for leave to appeal to the Illinois Supreme Court in which he raised the same substantive issues he presented to the Appellate Court. On April 2, 1997, the Illinois Supreme Court denied leave to appeal.

On April 16, 1997, Haqq filed a petition for post-conviction relief pursuant to the Illinois Post-Conviction Hearing Act, 725 ILCS 5/122-1, *et seq.* The trial judge denied that petition on April 25, 1997. On August 19, 1997, Haqq wrote a letter to the Clerk of the Circuit Court of Cook County alleging that, on May 19, 1997, he had mailed a notice of appeal from the denial of his post-conviction petition. The Clerk of the Circuit Court received that letter on September 5, 1997 and filed Haqq's notice of appeal on that same date. On September 12, 1997, the notice of appeal was denied as being untimely. The record reflects that Haqq did not file a motion for reconsideration, a petition for leave to appeal to the Illinois Supreme Court, or any other pleading seeking relief from the September 12, 1997 order. The record also reflects that the last recorded date of activity in Haqq's case was the September 12, 1997 order denying his notice of appeal.

On September 10, 1998, Haqq filed in this Court the instant petition for a writ of habeas corpus. In his petition, he raises four ground for relief: 1) that independent counsel should have been appointed to represent him during the post-trial hearing (Count I); 2) that trial counsel was

8

ineffective for failing to discover relevant evidence which could have established that the murder weapon belonged to the victim, thus corroborating Haqq's self-defense theory, and that the trial judge improperly excluded evidence which suggested the murder weapon belonged to the victim (Count II); 3) that trial counsel was ineffective for: a) acquiescing in the State's decision to not produce the results of certain fingerprint tests; b) failing to object to evidence improperly presented by the prosecution; and c) not meeting with Haqq to prepare for trial longer than 30 minutes (Count III); and 4) that appellate counsel was ineffective because he did not assert that trial counsel was ineffective for failing to discover relevant evidence (Count IV).

On February 16, 2000, this Court denied the respondent's motion to dismiss the instant petition for habeas corpus relief as untimely and ordered respondent to answer Haqq's claims. *See Haqq v. Carter*, 2000 WL 204237 (N.D. Ill. Feb. 16, 2000) (Marovich, J.).

## DISCUSSION

Federal courts may issue a writ of habeas corpus if a petitioner demonstrates that he is "in [state] custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2245(a); *Moffat v. Gilmore*, 113 F.3d 698, 702 (7th Cir. 1997); *see also Del Vecchio v. Illinois Dept. of Corrections*, 31 F.3d 1363, 1370 (7th Cir. 1994) (en banc) ("[F]ederal courts can grant habeas relief only when there is a violation of federal statutory or constitutional law."). The federal courts may not grant habeas relief under Section 2254 unless the state court's judgment "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Before a federal court may review the merits of a habeas petition, a petitioner must: (1) exhaust all remedies available in state courts; and (2) fairly present any federal claims in state court first, or risk procedural default. *See Chambers v. McCaughtry*, 264 F.3d 732, 737 (7th Cir. 2001) ("Failure to exhaust available state court remedies constitutes a procedural default."); *see also Bocian v. Godinez*, 101 F.3d 465, 468 (7th Cir. 1996) (same). "The habeas petitioner must present his federal constitutional claims initially to the state courts in order to give the state 'the opportunity to pass upon and correct alleged violations of its prisoners' federal rights.'" *McGowan v. Miller*, 109 F.3d 1168, 1172 (7th Cir. 1997) (quoting *Duncan v. Henry*, 513 U.S. 364, 365, 115 S.Ct. 887 (1995)).

A petitioner has exhausted his state court remedies "by either (a) providing the highest court in the state a fair opportunity to consider the constitutional issue, or (b) having no further available means for pursuing a review of one's conviction in state court." *Wallace v. Duckworth*, 778 F.2d 1215, 1219 (7th Cir. 1985). In this case, exhaustion is not an issue. Respondent concedes that Haqq has exhausted his state court remedies for purposes of federal habeas review because he has no further avenues in state court through which to challenge his conviction. (Resp. Answer at 4-5.) We now turn to the issue of procedural default.

I.  **Procedural Default**

The procedural default hurdle forbids the federal courts from addressing claims that were not fairly presented to the state court. *Jones v. Washington*, 15 F.3d 671, 675 (7th Cir. 1994). Procedural default occurs either when a state court has declined to address a federal claim because the petitioner failed to satisfy an independent state procedural requirement, *Coleman v. Thompson*, 501 U.S. 722, 729-30, 111 S.Ct. 2546 (1991), or when the petitioner fails to present a

claim to the state courts at the time, and in the way required by the state. *Hogan v. McBride*, 74 F.3d 144, 146 (7th Cir. 1996). In Illinois, a habeas petitioner is required to raise all arguments before the Illinois Supreme Court, even though the Court has discretionary control over its docket. *O'Sullivan v. Boerckel*, 526 U.S. 838, 843, 119 S.Ct. 1728 (1999).

In this case, respondent contends that Haqq has procedurally defaulted Counts I, III, and IV. Specifically, respondent argues that, with regard to Count I, the Illinois Appellate Court held that this claim was waived because Haqq did not properly preserve the argument that he was entitled to separate counsel for his post-trial hearing before the trial court, and thus the claim was defaulted for purposes of habeas review. As for Counts III and IV, respondent asserts that Haqq did not preserve his State post-conviction issues for habeas review by filing a petition for leave to appeal to the Illinois Supreme Court from the trial court's denial of his post-conviction petition. We will address each of these arguments in turn.

Under Illinois law, issues that could have been raised on direct appeal but were not are considered waived. *People v. Coleman*, 168 Ill.2d 509, 522, 660 N.E.2d 919 (1996). In Count I of his habeas petition, Haqq argues that he was entitled to separate counsel during his post-trial hearing because he was challenging the adequacy of the representation of his trial lawyer. However, the Illinois Appellate Court determined that Haqq waived this issues because he failed to "object to the alleged error at trial and failed to mention it in his post-trial motion." *Haqq*, No. 1-94-0859, at *20 (citing *People v. Campbell*, 264 Ill. App. 3d 712, 636 N.E.2d 575 (1992)). In the Seventh Circuit, to determine whether a petitioner has forfeited or procedurally defaulted any of his claims, we must look solely to state law. In fact, as the Seventh Circuit has explained, "[f]orfeiture depends on state law, and it is accordingly essential to know whether the state courts

11

have either held that a procedural misstep is a forfeiture, or would so hold if a collateral attack were filed in state court." *McBride*, 74 F.3d at 147. Here, the Illinois Appellate Court held that Haqq forfeited Count I pursuant to Illinois state waiver principles. It is not our place to contradict these types of determinations. Therefore, Haqq has procedurally defaulted Count I for purposes of habeas review.

As for Counts III and IV, respondent argues that Haqq has defaulted these claims as well because he failed to file a petition for leave to appeal to the Illinois Supreme Court from the ruling of the Illinois Appellate Court which dismissed his appeal in the post-conviction proceeding. We agree. In order for Haqq to preserve these claims for federal habeas review, he must provide the state courts "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan*, 526 U.S. at 845. In Illinois, "one complete round" is finished once the petitioner has presented the habeas claims, whether on direct appeal or on post-conviction appeal, at each stage of the appellate process, up through and including the Illinois Supreme Court. *See id.* at 847-48; *White v. Godinez*, 192 F.3d 607, 608 (7th Cir. 1999).

In response to this argument, Haqq contends that he has not defaulted these claims because, as he puts it, the Clerk of the Circuit Court of Cook County's office is in such disarray that he no longer has any remaining avenues for redress in the state court system. Unfortunately for Haqq, he misapprehends the statutory and precedential dictates of the procedural default doctrine. In terms of this case, Haqq has admitted in his papers that he did not file a petition for leave to appeal to the Illinois Supreme Court from the Illinois Appellate Court's ruling. While we cannot fault his frustration with the Clerk's office, that alone does not excuse procedural

default. In order for Haqq to have properly preserved Counts III and IV for our review, he was required to file a petition for leave to appeal to the Supreme Court, even if he believed such an appeal would have been futile. His decision to not do so is fatal to Counts III and IV. Accordingly, these claims are procedurally defaulted.

A federal court may nonetheless address the merits of a procedurally defaulted claim if the petitioner can establish cause and prejudice that would excuse it or, alternatively, establish that he fits within the miscarriage of justice exception to the cause and prejudice rule. *Coleman*, 501 U.S. at 750-51; *Wainwright v. Sykes*, 433 U.S. 72, 84-85, 97 S.Ct. 2497 (1977). Beginning with the cause and prejudice standard, the Supreme Court has interpreted "cause" under this test to be something external to the petitioner which is both beyond his control and which cannot be fairly attributed to him. *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639 (1986). In order to establish prejudice, the petitioner "must show not merely that the errors at . . . trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 494.

Aside from his attacks on the purported inefficiencies in the office of the Clerk of the Circuit Court of Cook County, Haqq has failed to establish cause and prejudice in his petition. Presumably, Haqq believes that these inefficiencies themselves constitute cause. We cannot agree with this argument. Nothing that the Clerk of the Circuit Court did or could do prevented Haqq from filing a petition for leave to appeal to the Illinois Supreme Court. In that petition, Haqq could have raised the same challenges to the Clerk's office's operations that he did in writings to this Court. However, his decision not to do so dooms these counts in the petition.

Although Haqq has failed to establish "cause" to excuse his procedural default, he can

13

still overcome this forfeiture by showing that he fits within the "miscarriage of justice" exception. This exception is limited to those extraordinary cases in which the petitioner is actually innocent of the crime for which he is imprisoned. *Bell v. Pierson*, 267 F.3d 544, 551 (7th Cir. 2001). Therefore, it requires a colorable claim of actual innocence, as opposed to legal innocence, coupled with an allegation of a constitutional claim. *See Sawyer v. Whitley*, 505 U.S. 333, 339-40, 112 S.Ct. 2514 (1992). The miscarriage of justice exception applies only if the petitioner can demonstrate that it is more likely than not that no reasonable jury would have convicted him in the absence of the alleged defect in the state court proceedings. *Schlup v. Delo*, 513 U.S. 298, 327, 115 S.Ct. 851 (1995). In this case, Haqq generally asserts that, but for the errors of his attorney and the trial court, he would not have been convicted of murder. Haqq fails to support this assertion with any evidence that he is actually innocent of killing Jabra. Absent such evidence, Haqq cannot establish that, but for the alleged errors in his trial, it is more likely than not that no reasonable trier of fact would have convicted him of felony murder and second degree murder. Thus, he presents nothing more than a claim of legal innocence that is immaterial to the present analysis. *See Montgomery v. Meloy*, 90 F.3d 1200, 1205 (7th Cir.), *cert. denied*, 519 U.S. 907 (1996). Accordingly, Counts I, III, and IV are barred from federal habeas review.

## II. Merits of the Claim Properly Presented

Based on the discussion above, Haqq has properly preserved only one of the claims in his habeas petition - that he was denied a fair trial because the trial court excluded relevant evidence and that defense counsel failed to discover relevant evidence which would have corroborated his self-defense theory. This claim was raised on direct appeal to the Illinois Appellate Court and

14

again in a petition for leave to appeal to the Illinois Supreme Court. Title 28, United States Code, Section 2254(d) governs the consideration of any claim adjudicated by a state court on its merits. Under that statute, we may grant habeas relief only if the state court's adjudication of the claim "was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(2)(1). Under subsection (d)(2), habeas relief is possible if the state court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented" in the state court.

The Supreme Court, in *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495 (2000), attempted to clarify the applicable standard of review within the meaning of section 2254. The Court noted that the act does not explicitly prescribe a recognizable standard of review for applying either of the statutory clauses. *Id.* at 385. Recognizing the need for further clarification and direction to lower courts, the Supreme Court concluded that the "[the act] plainly sought to ensure a level of 'deference to the determinations of state courts,' as long as those decisions do not conflict with federal law or apply federal law in an unreasonable way." *Id.* at 376. Additionally, the Supreme Court determined that, in passing the statute, "Congress wished to curb delays, to prevent 'retrials' on federal habeas petitions and to give effect to state convictions to the extent possible under the law. When federal courts are able to fulfill these goals within the bounds of the law, [the statute] instructs them to do so." *Id.* Therefore, this Court is directed to apply a deferential review of the state court decision unless it is determined that the state court violated federal law.

Applying this standard to Count II of Haqq's petition, we must deny it. In Count II, Haqq

15

raises two distinct arguments. First, he challenges the evidentiary ruling of the trial court when it excluded testimony regarding the gun found in the safe at the 41st Street lot. Second, he claims that his trial counsel was constitutionally ineffective because he did not discover the existence of the gun at the 41st Street lot until right before the trial began. We will address each of these arguments.

As to the evidentiary rulings, it is clear from the Illinois Appellate Court's ruling that the trial court's rulings were grounded in state law. In light of this, we again must reiterate that the federal habeas corpus procedure was not intended to serve as a vehicle to correct errors of state law. *See Koo v. McBride*, 124 F.3d 869, 874 (7th Cir. 1997). Rather, Haqq is entitled to relief only if the state court deprived him of a "constitutionally protected right." *Id.* Haqq claims that these evidentiary errors violated his right to due process. The test to determine whether a defendant was denied a fundamentally fair trial due to the exclusion of evidence hinges upon the materiality of the excluded evidence. *Milone v. Camp*, 22 F.3d 693, 702 (7th Cir. 1994). In this case, Haqq has not made the requisite showing that the excluded evidence was material. As both the trial court and Illinois Appellate Court noted, the evidence regarding the gun later found at the 41st Street lot would have had no effect on the ultimate determination of Haqq's guilt. This conclusion is bolstered by the fact that Haqq was incriminated by the testimony of three eyewitnesses who did considerable damage to his self-defense theory. Under these circumstances, we do not believe that the evidence was so powerful that its exclusion denied him a fundamentally fair trial. The state court's evidentiary rulings, therefore, provide no basis for habeas relief.

Haqq next claims that he was denied the effective assistance of counsel when his trial

lawyer failed to discover relevant evidence which would have corroborated his self-defense theory. We conclude that Haqq has failed to meet his burden to demonstrate that the state courts rendered a decision that was "contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court." 28 U.S.C. § 2254(d)(1).

The standard for reviewing a claim of ineffective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984). *Strickland* sets forth a two-prong analysis for determining ineffectiveness of counsel: 1) a showing that counsel's performance was deficient; and 2) a showing that the deficient performance prejudiced the defendant. *Id.* at 678. In order to prevail on his claim of ineffectiveness under the first prong of the *Strickland* test, Haqq must show that his counsel's performance fell below an objective standard of reasonableness. *Id.* In reviewing the challenged conduct, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* To satisfy the prejudice prong of the *Strickland* test, Haqq must show that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different. *Id.* This Court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.* Rather, "[i]f it is easier to dispose of an ineffective assistance of counsel claim based on the ground of lack of sufficient prejudice, which . . . will often be so, that course should be followed." *Id.*

In this case, Haqq has not met his burden to demonstrate that he was denied effective assistance of counsel regarding his lawyer's alleged failure to discover self-defense related

evidence. The Illinois Appellate Court's decision regarding this matter reflects ample consideration and appropriate application of the *Strickland* standard. The Appellate Court noted that "in light of the post-trial testimony, the [major case] worksheet would not have shed any more light on defendant's case or supported his claim of self-defense. In our view, counsel's failure to obtain the worksheet prior to trial was not ineffective assistance of counsel." *Haqq*, No. 1-94-0859, at *19. Therefore, the Appellate Court concluded that there was not unreasonable performance by trial counsel and that Haqq did not suffer prejudice.

Likewise, Haqq's attempt to make an ineffectiveness argument in this Court is unsuccessful. He fails to point to any United States Supreme Court precedent that supports his position, nor does he demonstrate that the Illinois Appellate Court failed to properly assess trial counsel's conduct pursuant to *Strickland*. Haqq merely states that he disagrees with the state court's determination. That is not enough to sustain his burden under § 2254(d). Therefore, Haqq's claim of ineffective assistance of counsel must fail.

## CONCLUSION

For the foregoing reasons, we deny the § 2254 petition for a writ of habeas corpus brought by petitioner Hafis Haqq. This is a final and appealable order. This case is terminated.

It is so ordered.

Wayne R. Andersen
United States District Judge

Dated: December 10, 2001